1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    CELLWITCH INC.,                        Case No.  19-cv-01315-JSW
8                    Plaintiff,
                                            **AMENDED CLAIM CONSTRUCTION**
9          v.                               **ORDER**
10   TILE, INC.,
11                   Defendant.
12
13         The Court has been presented with a technology tutorial and briefing leading up to a

14   hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). This Order

15   construes the disputed claim terms selected by the parties, which appear in United States Patent

16   No. 8,872,655 ("'655 Patent").

17                                    **BACKGROUND**

18         Cellwitch filed this suit on March 12, 2019, alleging that Defendant Tile, Inc. ("Tile" or

19   "Defendant") infringes the '655 Patent.  (*See* Dkt. No. 1.)  The '655 Patent "discloses a system for

20   tracking personal items" wherein "the system provides immediate notification of loss by

21   monitoring for loss of small items and notifying a person of that loss."  (Dkt. No. 103-2

22   ("IPR2020-00317") at 3; *see also* Dkt. No. 32 ¶ 19; Dkt. No. 191-4 ("Goldberg Decl.") ¶ 27; Dkt.

23   No. 199-4 ("Williams Decl.") ¶ 35.)  The '655 Patent's independent claims recite "a system for

24   tracking personal items that includes a wireless communication device attached to a personal item

25   (referred to in the patent as a 'patch') that wirelessly communicates (e.g., via Bluetooth or other

26   wireless protocol) with a user's wireless communication terminal."  (Williams Decl. ¶ 35.)  These

27   wireless communication terminals "may be associated with and configured to monitor (and

28   generate alerts regarding) particular patches associated with the user and which may be further

United States District Court
Northern District of California

configured as 'buddies' to monitor (and generate alerts regarding) patches that are associated with other users' terminals[.]" (Goldberg Decl. ¶ 27.)

Specifically, independent claims 1, 12, and 23 of the '655 Patent recite:

1. A system for monitoring of location of items, comprising:

a plurality of wireless devices, each of the plurality of wireless devices being associated with a monitored item;

a plurality of wireless communication terminals, each of the plurality of wireless communication terminals being associated with a respective user and associated with at least one respective associated wireless device of the plurality of wireless devices and configured to monitor the proximity of the at least one respective associated wireless device and to generate an alert when the proximity of at least one of the associated respective wireless devices from the associated wireless communication terminal meets or exceeds a proximity threshold to alert the respective user to the met or exceeded proximity threshold; and

processing system that is in communication with the plurality of wireless communication terminals, the processing system comprising a database that collects and stores data related to the plurality of wireless devices and the plurality of wireless communication terminals,

wherein at least one buddy wireless communication terminal of the plurality of wireless communication terminals is further configured to monitor the proximity of at least one wireless device of the plurality of wireless devices associated with one of the other wireless communication terminals and to generate an alert when the proximity of at least one of the wireless devices associated with one of the other wireless communication terminals from the buddy wireless communication terminal meets or exceeds a proximity threshold to alert the user of the buddy wireless communication terminal to the met or exceeded proximity threshold.

(Dkt. No. 191-1 ("'655 Patent") cl. 1.)

12. A computer-based method for monitoring of location of items, comprising:

providing a plurality of wireless devices, each of the plurality of wireless devices being associated with a monitored item;

configuring each of a plurality of wireless communication terminals, each of the plurality of wireless communication terminals being associated with a respective user and associated with at least one respective associated wireless device of the plurality of wireless devices, to monitor the proximity of the at least one respective associated wireless device and to generate an alert when the proximity of at least one of the associated respective wireless devices exceeds a

United States District Court
Northern District of California

proximity threshold to alert the respective user to the met or exceeded proximity threshold;

collecting and storing, using a processing system that is in communication with the plurality of wireless communication terminals, data related to the plurality of wireless devices and the plurality of wireless communication terminals; and

configuring at least one buddy wireless communication terminal of the plurality of wireless communication terminals to monitor the proximity of at least one wireless device of the plurality of wireless devices associated with one of the other wireless communication terminals and to generate an alert when the proximity of at least one of the wireless devices associated with one of the other wireless communication terminals from the buddy wireless communication terminal meets or exceeds a proximity threshold to alert the user of the buddy wireless communication terminal to the met or exceeded proximity threshold.

(*Id.* cl. 12.)

23. A system for monitoring of location of items, comprising:

a plurality of wireless devices, each of the plurality of wireless devices being associated with a monitored item;

a plurality of wireless communication terminals, each of the plurality of wireless communication terminals being associated with a respective user and associated with at least one respective associated wireless device of the plurality of wireless devices and configured to monitor the proximity of the at least one respective associated wireless device and to generate an alert when the proximity of at least one of the associated respective wireless devices from the associated wireless communication terminal meets or exceeds a proximity threshold to alert the respective user to the met or exceeded proximity threshold; and

a processing system that is in communication with the plurality of wireless communication terminals, the processing system comprising a database that collects and stores data related to the plurality of wireless devices and the plurality of wireless communication terminals,

wherein each of the plurality of wireless communication terminals is further configured to detect at least one wireless device of the plurality of wireless devices the respective wireless communication terminal is not configured to monitor and to transmit data related to the at least one wireless device of the plurality of wireless devices the respective wireless communication terminal is not configured to monitor to the processing system,

wherein, if the proximity of a lost wireless device of the plurality of wireless devices from the associated wireless communication terminal exceeds the proximity threshold, the processing system is configured to identify one of the other wireless communication terminals that detects the lost wireless device and to generate a signal

United States District Court
Northern District of California

> enabling direct communication between the user of the wireless
> communication terminal associated with the lost wireless device and
> the user of the

(*Id.* cl. 23.)

In its Amended Complaint, Cellwitch alleges that Tile leveraged Cellwitch's invention to establish Tile's dominant position in the personal object tracking sector.  (*See* Dkt. No. 32 ¶ 41.) In response, on December 18, 2019, Tile filed a petition before the Patent Trial and Appeal Board ("PTAB") for *inter partes* review ("IPR") of the '655 Patent, which was instituted on May 22, 2020.  Tile then moved for an order staying the litigation, (Dkt. No. 61) which the Court granted on January 17, 2020.  (Dkt. No. 68.)

The PTAB issued a Final Written Decision on May 13, 2021.  In its decision, the PTAB found independent claims 1, 12 and 23, as well as dependent claims 2–3, 10–11, 13–15, and 22 unpatentable under 35 U.S.C. § 103 as obvious in view of prior art references U.S. Patent No. 6,697,576 B2 ("Hayes"); U.S. Patent Appl. No. 2006/0055538 A1 ("Ritter"); and U.S. Patent Appl. No. 2004/0087314 A1 ("Duncan").  (*See* IPR2020-00317 at 20–75.) The PTAB did not find unpatentable claims 4 and 16 of the '655 Patent, which recited the limitation:

> wherein the collected data comprises data relating to at least one of
> the following: time of day the wireless device exceeds the proximity
> threshold, location at which the wireless device exceeds the proximity
> threshold, and the frequency at which the wireless device exceeds the
> proximity threshold.

(*See id.* at 76–83.)  The PTAB further concluded that claims 5–9 and 17–21 were not unpatentable as those claims depend on claims 4 and 16.  (*See id.* at 85–86.)

The Federal Circuit affirmed the PTAB and issued a mandate. (Dkt. No. 200-9.)  The Court then lifted the stay on January 13, 2023 (Dkt. No. 119.)  Cellwitch now asserts infringement of claims 4–9 and 16–21 of the '655 Patent.

## ANALYSIS

### A.     Legal Standard

Claim construction is a question of law for the Court.  *Markman*, 517 U.S. at 384. It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.

2005) (*en banc*). "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted).  It is the Court's duty to resolve "fundamental dispute[s] regarding the scope of a claim term[.]" *Id.* at 1362; *see also Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury. In order to fulfill this obligation, the court must see to it that disputes concerning the scope of the patent claims are fully resolved." (citation omitted)).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Phillips*, 415 F.3d at 1312).  The ordinary and customary meaning of a claim term is "not the meaning of the term in the abstract," but rather "its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1042 (Fed. Cir. 2019) ("Claim construction seeks to ascribe to claim terms the meaning a person of ordinary skill in the art at the time of invention would have given them."); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("Claim construction requires a determination as to how a person of ordinary skill in the art would understand a claim term in the context of the entire patent, including the specification." (internal quotation omitted)).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Additionally, "the context in which a claim term is used in the asserted claim can be highly instructive." *Id*.  However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315. The scope of the claims must be "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quotation

1    omitted). Thus, the construction that "stays true to the claim language and most naturally aligns

2    with the patent's description of the invention will be, in the end, the correct construction." *Id*.

3        In addition to the claims and the specification, the prosecution history may be used "to

4    provide[ ] evidence of how the PTO and the inventor understood the patent."  *Id*. at 1317. "[A]ny

5    explanation, elaboration, or qualification presented by the inventor during patent examination is

6    relevant, for the role of claim construction is to capture the scope of the actual invention that is

7    disclosed, described and patented."  *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed.

8    Cir. 2015) (quotation omitted). The claims, specification, and prosecution history together

9    constitute the "intrinsic evidence" that forms the primary basis for claim construction.  *Phillips*,

10   415 F.3d at 1312–17 (citation omitted). Courts may also consider extrinsic evidence, such as

11   dictionaries, treatises, and expert opinions, if it is "helpful in determining the 'true meaning of

12   language used in the patent claims' " and is not contradicted by the intrinsic evidence.  *Id*. at 1318

13   (quoting *Markman*, 52 F.3d at 980).

**B.    Person of Skill in the Art (POSITA)**

15       The parties and their experts agree that a person of ordinary skill in the art ("POSITA") in

16   the context of the '655 Patent would have been a person "having 'a bachelor's degree in computer

17   science, computer engineering, or a related field, with at least two years of experience working

18   with device tracking systems.'"  (*See* Goldberg Decl. ¶ 26; Williams Decl. ¶ 49.)

**C.    Evidentiary Objections**

20       Tile, in its responsive claim construction brief, brings two evidentiary objections:  First,

21   Tile argues that Cellwitch's introduction and reliance upon Docket No. 191-2 is improper, as that

22   document is an incomplete copy of the '655 Patent's file history.  (*See* Dkt. No. 230 ("Tile Br.") at

23   4.)  Tile argues that the Court should admit Docket No. 186-17 instead, which Cellwitch does not

24   object to.  (*See* Dkt. No. 265 ("Tr.") at 5:21–6:1.)  As such, the Court admits and considers Docket

25   No. 186-17 as the entire file history of the '655 Patent.

26       Second, Tile argues that the testimony and opinion of Cellwitch's expert Dr. Goldberg

27   should be excluded under Federal Rule of Evidence 702 and the standards for expert witness

28   testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  (*See* Tile Br.

United States District Court
Northern District of California

at 4–5.)  Tile argues that under *Daubert*, Dr. Goldberg's testimony is unreliable because he failed to consider relevant facts and data, such as reviewing all of the '655 Patent's intrinsic record, or the PTAB's Final Written Decision in the IPR of the '655 Patent.  (*See id.*)

The Court finds that Tile's objections go to the weight of Dr. Goldberg's testimony, but does not warrant outright exclusion of his declaration.  Under *Daubert*, the district court must serve as a gatekeeper to "ensure that any scientific testimony is 'not only relevant, but reliable.'" *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) (quoting *Daubert*, 509 U.S. at 589).  However, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Id.*  Moreover, in the context of claim construction, the need for outright exclusion is lessened as "any potential prejudice or confusion is neutralized when the Court serves as the factfinder." *Altera Corp. v. PACT XPP Techs., AG*, No. 14-CV-02868-JD, 2015 WL 4999952, at *15 n.13 (N.D. Cal. Aug. 21, 2015); *see also Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("While these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met.").  Here, Dr. Goldberg's opinions are founded upon sound methodologies, and the evidence he relies upon is relevant and reliable.  Tile's objections raise questions as to the correctness of certain of Dr. Goldberg's *conclusions*, based primarily on arguments that he failed to adequately consider certain relevant and reliable evidence (e.g., claim 10 of the '655 patent).  To that end, the Court considers these objections relevant in deciding how much weight to give Dr. Goldberg's opinions, but does not find flaws sufficient in Dr. Goldberg's overall methodology to warrant exclusion of his opinions entirely.  *See Seaboard Lumber*, 308 F.3d at 1302 (finding no abuse of discretion where district court did not exclude testimony on *Daubert* grounds in bench trial).

\\

\\

\\

United States District Court
Northern District of California

United States District Court
Northern District of California

### D.   Construction of Disputed Claims

#### 1.   "wireless communication terminal"

| Cellwitch's Proposed Construction | Tile's Proposed Construction |
|---|---|
| "wireless enabled mobile device" | No construction necessary |

The term "wireless communication terminal" appears in claims 1, 8–11, 12, and 20–23 of the '655 Patent.  The claims recite a plurality of "wireless communication terminals," each being "associated with a respective user and associated with at least one respective associated wireless device".  ('655 Patent cls. 1, 8–11, 12, 20–23.)

The parties dispute whether a "wireless communication terminal" must be a "mobile device," or whether it may also include devices such as "base stations."  It is undisputed that, during prosecution of the '655 Patent, the applicant amended the claims to replace the term "mobile station" with "wireless communication terminal."  (*See* Dkt. 186-17 at 313–21.)  Cellwitch argues that this amendment was a simple substitution, such that the terms "wireless communication terminal" and "mobile station" are synonymous.  (*See* Dkt. No. 190 ("Cellwitch Br.") at 5–7.)  Tile argues that the amendment was intended to broaden the scope of the claims, that the term "wireless communication terminal" requires no construction, and that Cellwitch's position improperly imports limitations from a specific embodiment in which the "wireless communication terminal" is a "wireless enabled mobile device" or "mobile station."  (*See* Tile Br. at 5–6.)

The Court agrees with Tile.  The plain and ordinary meaning of "wireless communication terminal" is not limited to a "mobile" device.  (*See* Williams Decl. ¶ 146.)  Cellwitch presents no evidence that the patentee "clearly expressed [an] intent" to redefine "wireless communication terminal" in such a way.  *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *see also Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Rather, the intrinsic evidence here points against Cellwitch's proposed construction.  Under the doctrine of claim differentiation, "[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."  *Merck*, 395 F.3d at 1372; *see also Wasica Fin.*

8

*GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). '655 Patent claims 10 and 22 recite systems of claims 1 and 12, "wherein the at least one of the plurality of wireless communication terminals is a wireless enabled mobile device." ('655 Patent cls. 10, 22.)  Applying Cellwitch's proposed construction, these limitations would effectively read "wherein the at least one of the plurality of [wireless enabled mobile devices] is a wireless enabled mobile device"—a tautology that would render claims 10 and 22 entirely superfluous.  A POSITA, having read the entirety of the '655 Patent, would not construe the plain and ordinary meaning of "wireless communication terminal" in such a way as to "render[] [claims 10 and 22] void, meaningless, or superfluous."  *Wasica*, 853 F.3d at 1288 n.10.

Cellwitch's arguments relying on *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) do not compel a different result.  In *Nystrom*, the Federal Circuit affirmed the district court's construction of the term "board" as meaning a "piece of elongated construction material made from wood cut from a log," notwithstanding further dependent claims that specified the board must be made of wood.  There, the court reasoned that the specification and prosecution history provided strong evidence that the term "board" must be limited to wooden material.  The *Nystrom* court found that this evidence was sufficient to overcome the argument from claim differentiation, because "[d]ifferent terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper."  *Nystrom*, 424 F.3d at 1143.  However, in *Nystrom*, the dependent claim at issue included several limitations in addition to the board being made of wood, such that the court's construction did not render the entire claim superfluous.   In contrast, Cellwitch's proposed construction here would render the *entirety* of claims 10 and 22 superfluous, as the only limitation distinguishing those claims from the independent claims is the limitation that "at least one of the plurality of wireless communication terminals is a wireless enabled mobile device."  Because the "presumption [of claim differentiation] is 'especially strong'" where, as here, "the limitation in dispute is the only meaningful difference between an independent claim and dependent claim," the Court finds that presumption as counseling "strongly against"

United States District Court
Northern District of California

1    Cellwitch's construction. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,* 690 F.3d 1318,

2    1324 (Fed. Cir. 2012) (quotation omitted).[1]

3           Moreover, unlike in *Nystrom*, neither the intrinsic nor extrinsic evidence before the Court

4    strongly support Cellwitch's proposed construction here.  The specification makes repeated

5    mention of "mobile stations" but contains no indication that the terms "mobile station" and

6    "wireless communication terminal" are intended to be synonymous or interchangeable.

7    Cellwitch argues that the prosecution history indicates that the patentee intended a "simple

8    substitution" when it amended the claims to replace "mobile station" with "wireless

9    communication terminal," but the Court finds no indication of such intent reflected in the

10   prosecution history.  Cellwitch's only evidence in support of its assertion that a POSITA would

11   understand the term "wireless communication module" to be "readily mapped back to the 'mobile

12   stations' discussed throughout the specification" and prosecution history is the opinion of its

13   expert Dr. Goldberg, but Dr. Goldberg only repeats Cellwitch's assertion as his opinion, without

14   any support to either the intrinsic or extrinsic record.  (*See* Goldberg Decl. ¶¶ 28–29, 31.)

15   Moreover, while the Court declined to exclude Dr. Goldberg's opinion in its entirety, the Court

16   finds that here, Dr. Goldberg's opinions are entitled to less weight, in light of his admissions that

17   he did not consider the relevance of claim 10 when opining on the meaning of "wireless

18   communication terminal".  (*See* Dkt. No. 191-5 ("Goldberg Tr.") at 41:1–48:12.)  That oversight

19   casts significant doubt on Dr. Goldberg's conclusion that a POSITA would, having read the

20   intrinsic record of the '655 Patent, understand the term "wireless communication terminal" to

21   mean a "wireless enabled mobile device."

22          For the foregoing reasons, the Court finds no reason to depart from the plain and ordinary

23   meaning of the term "wireless communication terminal," which as Mr. Williams opines, requires

24   no construction.  (*See* Williams Decl. ¶ 146.)

25   \\

26

27   ────────────────

     [1] For the same reason, Cellwitch's argument that Tile's proposed construction would render claim

28   3 superfluous is not persuasive.  Unlike claims 10 and 22, claim 3 recites other limitations that are
     meaningfully different from claim 1, beyond just comprising a "base station."

United States District Court
Northern District of California

### 2. "monitor the proximity of"

| Cellwitch's Proposed Construction | Tile's Proposed Construction |
|---|---|
| "keep track of whether the wireless device is within range of or a defined distance from the wireless communication terminal" | No construction necessary |

The term "monitor the proximity of" appears in claims 1 and 12 of the '655 Patent, which recite configuring a "plurality of wireless communication terminals" and "at least one buddy wireless communication terminal" to "monitor the proximity of at least one wireless device". ('655 Patent cls. 1, 12.)

Cellwitch argues that the plain and ordinary meaning of the term "monitor" should be construed as requiring "keep[ing] track of," as opposed to merely "finding" or "detecting." (*See* Cellwitch Br. at 7–8.) Tile argues that this construction was previously rejected by the PTAB (and subsequently affirmed by the Federal Circuit), and that Cellwitch should be collaterally estopped from asserting the same argument before this Court. (*See* Tile Br. at 6–8.) Tile further argues that, should collateral estoppel not apply, the Court should adopt the PTAB's reasoning in rejecting Cellwitch's proposed construction. (*See id.* at 8.)

The Court begins with Tile's collateral estoppel argument. "In general, PTAB decisions may collaterally estop a federal district court." *Regents of Univ. of Minnesota v. LSI Corp.*, No. 5:18-CV-00821-EJD, 2023 WL 5520958, at *7 (N.D. Cal. Aug. 25, 2023) (citing *Papst Licensing GMBH & Co. KG v. Samsung Elecs. Am., Inc.*, 924 F.3d 1243, 1250–51 (Fed. Cir. 2019)). Previously, the Federal Circuit has expressed doubt about collateral estoppel of PTAB claim constructions, reasoning that the PTAB applied a different, "broadest reasonable interpretation" standard for claim construction. *See SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016). Since that decision, the PTAB has rejected the "broadest reasonable interpretation" standard in favor of the same *Phillips* standard that this Court now uses to construe the terms. *See* 37 C.F.R. § 42.100(b) (2019). The PTAB expressly applied that standard when construing terms in the '655 Patent IPR. *See* IPR2020-00317 at 9. Accordingly, collateral estoppel would apply to the terms the PTAB construed in its Final Written Decision, so long as

1   "the traditional elements of collateral estoppel are met." *Regents of Univ. of Minnesota*, 2023 WL

2   5520958, at *7. Whether collateral estoppel applies depends on the law of the regional circuit. *Id.*

3        The Ninth Circuit applies a three-part test, in which the party seeking to enforce collateral

4   estoppel must demonstrate that "(1) the issue necessarily decided at the previous proceeding is

5   identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final

6   judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party

7   or in privity with a party at the first proceeding." *Hydranautics v. FilmTex Corp.*, 204 F.3d 880,

8   885 (9th Cir. 2000) (quotation omitted).  Here, there is no dispute that the second and third

9   elements are met—the IPR proceedings ended in a final judgment, which was affirmed on appeal

10  by the Federal Circuit, and the parties in that IPR are the same in this action.  Thus, the question

11  turns on whether the issue in dispute now was necessarily decided in the prior IPR proceedings.

12  This element is met "where the court heard evidence and argument from both parties, and

13  specifically ruled on the issue[.]"  *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001).

14       The Court finds that collateral estoppel does not apply here because the issue before the

15  Court now—the construction of "monitor the proximity of" under the *Phillips* standard—was not

16  actually litigated in the IPR.  The PTAB, in its Final Written Decision, construed only three terms:

17  (1) "generate an alert when the proximity . . . meets or exceeds a proximity threshold"; (2) "the

18  processing system is configured . . . to generate a signal enabling direct communication"; and (3)

19  "base station."  IPR2020-00317 at 9–18.  Notably, it did *not* construe the term "monitor the

20  proximity of."  Instead, the PTAB merely rejected a cursory argument made by Cellwitch (and its

21  IPR expert) that Tile's prior art (Ritter) "alone does not disclose the 'buddy' element because

22  '*finding* another's tag is a very different thing than *monitoring* another's tag.'"  *Id.* at 39 (citation

23  omitted) (emphasis original).  In so doing, the PTAB appeared to have made two rulings.  First, it

24  ruled that "[t]o the extent that Patent Owner requires the prior art to use the exact terminology as

25  the claims, an obviousness determination is not an *ipsissimis verbis* test."  *Id.* at 43.  Second, it

26  ruled that Ritter did disclose "monitoring" of nearby tags because "[e]ach mobile device in Ritter

27  searches continuously or periodically for neighboring tags . . . ."  *Id.* at 44.  Neither of these

28  rulings applied the *Phillips* standard of claim construction to the meaning of "monitoring the

United States District Court
Northern District of California

proximity" and therefore that question has not been actually litigated such that collateral estoppel should apply. *See SkyHawke*, 828 F.3d at 1376 (declining to apply collateral estoppel because claim construction issue was not actually litigated under *Phillips* standard).

The Court next considers the parties' other arguments in favor of their proposed constructions. Cellwitch argues that the intrinsic evidence "clearly distinguishes between patches that may be merely *detected* and those that are *monitored*" and that the plain and ordinary meaning of the word "monitor" involves more than mere detection. (Cellwitch Br. at 8–10; *see also* Goldberg Decl. ¶ 44; Dkt. No. 191-10 (defining "monitor" as "to watch, check or observe for a special purpose); Dkt. No. 191-11 (defining "monitoring" as "[t]he process of observing a system to verify that its parameters are within prescribed limits" and "monitor" as "[c]ontinual or periodic testing with comparison to observe or determine trends.").  Tile counters by urging this Court to adopt the PTAB's reasoning in rejecting Cellwitch's prior argument, and that the intrinsic evidence makes clear that detection may be a part of monitoring.  (Tile Br. at 8.)

The Court, having reviewed the intrinsic and extrinsic evidence, adopts the construction: "keep track of, including by periodic or continuous detection of, whether the wireless device is within range of or a defined distance from the wireless communication terminal."  Both parties agree that "detection" may be part of "monitoring."  (*See* Tile Br. at 8; Dkt. No. 203 ("Cellwitch Reply Br." at 5.)  The Court agrees with Cellwitch that the plain and ordinary meaning of "monitor" implies something more than a singular instance of detection.  The '655 Patent specifically describes the process of monitoring as repeated detections through, e.g., polling messages.  *See e.g.*, '655 Patent at 10:45–54.  Similarly, Cellwitch's extrinsic evidence suggests that "monitoring" is understood to mean more than a singular detection, evidence which Tile does not rebut except to reference the PTAB's decision.  (*Compare* Goldberg Decl. ¶¶ 45–46 *with* Williams Decl. ¶ 151.)  But, as modified, this Court's construction is also consistent with the PTAB's ruling, which found that Ritter disclosed "monitoring" the proximity of tags through "search[ing] continuously or periodically for neighboring tags . . . ." IPR2020-00317 at 44.  Thus, to the extent that Tile is concerned that Cellwitch's proposed construction "will come to a different conclusion than both the PTAB and the Federal Circuit, perhaps to somehow upend the

invalidity of Claims 1 and 12" (Tile Br. at 6), such concerns should not be relevant under the

Court's construction, which explicitly adopts the PTAB's reasoning in finding claims 1 and 12

unpatentable.

### 3.  "when the proximity . . ."

| Cellwitch's Proposed Construction | Tile's Proposed Construction |
|---|---|
| No construction necessary<br><br>If construed:<br><br>"when it is determined that the wireless device is out of range of the wireless communication terminal or otherwise is estimated to be at or beyond a defined distance from the wireless communication terminal" | "[generate an alert] at a time close to the moment when at least one of the associated respective wireless devices moves outside of or beyond a proximity threshold in relation to the associated wireless communication terminal, wherein that time depends on (1) the time interval between polling messages, and (2) the length of time the terminal takes to send a polling message, receive responses from those patches within range, ascertain the identities of the patches, and check the identities of the patches that responded to the polling message against those associated with the terminal" |

The term "[w]hen the proximity of at least one of the wireless devices . . . meets or exceeds

a proximity threshold" appears in claims 1 and 12 of the '655 Patent, which recite wireless

communication terminals which are configured to generate an alert "[w]hen the proximity of at

least one of the wireless devices . . . meets or exceeds a proximity threshold."  ('655 Patent cls. 1,

12.)

The PTAB expressly construed this term in its Final Written Decision, which binds this

Court and the parties under collateral estoppel.  Specifically, the PTAB rejected Cellwitch's

"implicit construction that interprets the term 'when' as 'at the time of' meeting the threshold, or

requires generating an alert 'at the moment of loss' or at the precise moment of meeting the

threshold."  IPR2020-00317 at 14.  Instead, the PTAB concluded that "'when' encompasses a time

close to the moment when the terminal (mobile station) determines one of its wireless devices

(patches) fails to respond to a polling message."  *Id.*  It continued that this "time depends on (1)

the time interval between polling messages, and (2) the length of time the terminal takes to send a

polling message, receive responses from those patches within range, ascertain the identities of the patches, and check the identities of the patches that responded to the polling message against those associated with the terminal." *Id.*

Notably, the PTAB's construction is limited to embodiments of the '655 Patent that utilize periodic polling messages to determine whether the at least one of the associated respective wireless devices moves outside of or beyond a proximity threshold in relation to the associated wireless communication terminal. This Court does not read the PTAB's decision as affirmatively construing the claim term as *always* meaning a time close to when the terminal determines one of its wireless devices fails to respond to a polling message, as "a claim construction that does not encompass a disclosed embodiment is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) (quoting *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004). It would therefore be incorrect for this Court to adopt the PTAB's construction verbatim, as Tile proposes, as such a construction would exclude embodiments disclosed in the '655 Patent that utilize continuous transmission instead of periodic polling messages. (*See, e.g.*, '655 Patent at 7:29–38.)

The Court finds that Cellwitch's proposed construction, as modified by this Court in its tentative, is most consistent with the PTAB's construction while not importing limitations from a particular embodiment. Tile's inclusion of language defining the time interval in the periodic polling embodiment is unnecessary, as its construction effectively construes the term "when" to mean "at a time close to when" (consistent with the PTAB's construction) but then further construes "at a time close to when" as "wherein/including when that time depends on . . . ." But "[a] court need not attempt the impossible task of resolving all questions of meaning with absolute, univocal finality." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). Instead, the Court need only construe terms "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803, (Fed.Cir.1999). There is no controversy that, in the case of the periodic polling embodiments, Cellwitch is bound by collateral estoppel from taking a position inconsistent with the PTAB's construction. Tile's proposed construction would only risk confusing the jury by overemphasizing

United States District Court
Northern District of California

that embodiment.

Tile also argues that Cellwitch's construction "*entirely uncoupl[es]* the time the alert is generated and determination made from the moment of loss . . . ." (Tile Br. at 10 (emphasis original).)  Apparently, Tile objects to Cellwitch's inclusion of the phrase "it is determined" such that the timing of the alert is now dependent on the *determination* of the loss, instead of the actual moment of loss.  (*See* Tr. at  47:13–48:6.)  However, the PTAB, in its Final Written Decision, expressly found that the intrinsic evidence "indicated that the wireless communication terminal cannot generate the 'alert' until it determines that the proximity of the wireless device has met or exceeded the proximity threshold."  IPR2020-00317 at 11.  Accordingly, the Court finds Cellwitch's inclusion of the phrase "it is determined" to be consistent with the PTAB's construction.

For the foregoing reasons, the Court adopts the construction: "at a time close to when it is determined that the wireless device is out of range of the wireless communication terminal or otherwise is estimated to be at or beyond a defined distance from the wireless communication terminal."

### 4.  "the collected data"

Because the Court finds that claims 5–9 and 17–21 are invalid for indefiniteness, it need not reach this claim term dispute, which relates only to terms in claims 5–9 and 17–21 of the '655 Patent.

### 5.  "alert" / "notification" / "alarm"

| Cellwitch's Proposed Construction | Tile's Proposed Construction |
|---|---|
| No construction necessary<br><br>If construed:<br><br>"visual, auditory, or haptic signal that indicates an event" | *Indefinite*<br><br>Alternative construction for alert: "urgent warning transmitted to the user that can be observed regardless of active use of the wireless communication terminal" |

The term "alert" appears in claims 1 and 12 of the '655 patent, while the term "notification" appears in claims 8–9, and 20–21.  The term "alarm" appears in claims 9 and 21.

United States District Court
Northern District of California

1   Claims 1 and 12 recite generating "an alert" while claims 8 and 20 require the alert "comprises a

2   notification to the user through the respective associated wireless communication terminal . . . ."

3   ('655 Patent cls. 1, 8, 12, 20.)  Claims 9 and 21 in turn require that the "method of providing

4   notification comprises at least one of the following: alarm generated by the respective associated

5   wireless communication terminal and vibration of the respective associated wireless

6   communication terminal."  (*Id*. cls. 9, 21.)

7          Tile's primary argument is that these claim terms are indefinite.  Tile's argument for

8   indefiniteness is two-fold.  First, Tile argues that because the terms "alert," "notification," and

9   "alarm," are used in separate claims, they presumptively have different, distinct meanings.  (*See*

10  Tile Br. at 13.)  Tile argues that because the claim language states "the alert comprises a

11  notification . . ." and that the "notification comprises . . . alarm," the terms "alert," "notification,"

12  and "alarm" must be defined hierarchically, such that "alert includes but is not limited to a

13  notification and notification includes but is not limited to an alarm[.]"  (*Id*.)  Essentially, Tile

14  argues that the claim language requires that the term "alarm" be a subset of the term "notification"

15  which is in turn a subset of "alert."  Tile then argues that, relying upon Mr. William's opinion, a

16  POSITA would not be able to determine the metes and bounds of each term with reasonable

17  certainty, because "[t]he specification does not define them  and provides no clarity beyond

18  repeating the claims' hierarchical relationship."  (*Id.* at 14.)

19          As the party arguing for indefiniteness, Tile bears the burden to prove by clear and

20  convincing evidence that the terms "alert," "notification," and "alarm," have no ascertainable

21  meaning, such that the claims in question "fail to inform, with reasonable certainty, those skilled

22  in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S.

23  898, 901 (2014).  The Court finds that Tile has failed to meet that high burden here.  Tile's

24  indefiniteness argument is predicated upon its assertion that the claim terms must have different

25  meanings, in a hierarchical structure.  While it is true that the word "comprises" means "including

26  but not limited to,"  *see, e.g., Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360–61 (Fed.

27  Cir. 2007), here the Court is not convinced that the claim language necessitates such a strict

28  hierarchical structure of the terms "alert," "notification," and "alarm."

First, the '655 Patent does not claim that the "alert" comprises a "notification" without a qualification, and instead claims that "the alert comprises a notification *to the user through the respective associated wireless communication terminal . . . .*"   Thus, by common rules of grammar, there are two additional limitations upon the term "notification" in this claim: (1) that it be sent "to the user," and (2) that it be sent "through the respective associated wireless communication terminal."   In light of these additional limitations, the Court does not read the claims as requiring that "alert" necessarily be a superset of "notification."   As for "alarm", claims 9 and 21 of the '655 Patent states that "the *method* of providing notification comprises at least one of the following: *alarm* generated by the respective associated wireless communication terminal and *vibration* of the respective associated wireless communication terminal."   While the Court does agree with Tile that the language of claims 9 and 21 suggest that "alarm" must be distinct from "notification" (and "alert") as describing a *"method* of providing notification", as discussed below, the Court finds that the specification provides sufficient information to inform a POSITA as to the scope of the term "alarm."

The Court turns to the parties' dispute over the correct construction of "alert."   First, the parties dispute whether an "alert" must be "urgent."   Tile argues that an "alert" must be an "urgent warning" because the specification describes alerts being generated at a time close to the potential loss of the wireless device, and that the specification and file history confirm that the alert's purpose is to allow immediate recognition/indication of that loss.  (*See* Tile Br. at 14–15.)   However, the claims only describe generating an alert "when the proximity" of certain wireless devices meets or exceeds a proximity threshold.  (*See* '655 Patent cls. 1, 12, 23.)   The Court (and the PTAB) has already construed the term "when the proximity . . ." as meaning "at a time close to when it is determined that the wireless device is out of range of the wireless communication terminal or otherwise is estimated to be at or beyond a defined distance from the wireless communication terminal."  (*See* Section D(3), *supra*.)   Thus, the Court sees no reason to further construe the term "alert" as being "urgent" when the '655 Patent makes clear that any alert being generated must be generated "at a time close to when" the proximity threshold is met or exceeded. The addition of "urgent" to this construction would be duplicative at best, and only serve to

confuse the jury as to the meaning and scope of the word "urgent."

Tile also argues that the construction of alert must include that it is capable of observation "regardless of active use of the wireless communication terminal." (*See* Tile Br. at 15; Williams Decl. ¶ 89.)  Mr. Williams cites extensively to the patent specification in support of this opinion, but upon the Court's review, none of the cited passages support Mr. Williams' conclusion that alerts "must be able to call an otherwise unaware user's attention to the condition." (Williams Decl. ¶ 89.)  Instead, all of these passages merely describe that the alert must "indicate an event" to the user as Cellwitch proposes (e.g., that a patch is no longer in proximity with the wireless communication terminal).  (*See* '655 Patent 7:3–5 (alert may be ringing or displaying message); 3:3–4 (alert is transmitted to user); 5:21–26 (alert provides immediate indication of loss); 5:57-67 (alert to user when an item is lost); 6:29-33 (alert may describe the particular patch that is lost); 6:40-44 (option to configure predetermined distance above which alert is raised); 6:63-7:10 (alert issued to indicate patch is not in proximity, and describing forms of alerts); 9:18-20 (alert can be raised upon detection of item having been recorded as stolen); 13:14-16 (alert may be generated to all users within a network); 13:46-49 (alert may be generated when one of the patches exceeds a monitoring parameter); 13:55-62 (patches may be configured to generate alerts without a mobile station).)  Indeed, nothing in the intrinsic evidence requires alerts to be observable regardless of active use of the wireless communication terminal, and the extrinsic evidence Mr. Williams cites at best *describes* some forms of alerts that are so observable, but others that are not.  (*See e.g.,* Williams Decl. ¶ 89 (describing alerts such as emails which are not observable regardless of active use of the wireless communication terminal)). Accordingly, the Court declines to construe the term "alert" as having such a requirement.

Finally, the Court considers whether an "alert" must be "auditory, visual, or haptic", as Cellwitch proposes.  While the specification describes that "[t]he alert may be in any suitable form," it does not specify that the alert *must* be "auditory, visual, or haptic."  (*See* '655 Patent at 7:3–5).  Rather, the specification describes an *example* of the alert as being "the mobile station ringing and displaying a message stating the reason for the alert."  (*Id.*)  Similarly, the specification states that patches may "generate alerts, *such as* audio or visual alarms . . . ."  (*Id.* at

United States District Court
Northern District of California

13:46–49 (emphasis added).)  These passages indicate that while "alarms" must be audio or visual, no such limitation was intended for the term "alert" in the context of the '655 Patent.

For the foregoing reasons, the Court adopts the construction of "alert" as "signal indicating an event." Because the '655 Patent uses the term "notification" interchangeably with "alert" (*see e.g.*, Goldberg Decl. ¶¶ 63–69; Williams Decl. ¶ 75) the Court adopts the same construction for "notification."  As for "alarm," in light of the specification's description of alarms as either "audio or visual" and the claim language distinguishing "alarm" from "vibration" (*see* '655 Patent at 13:46–49; cls. 9, 21), the Court adopts the construction of alarm as "visual or auditory signal indicating an event."

### 6.  "learning module that uses the collected data to provide at least one service to a respective user" (claim 5) / "providing, using a learning module, at least one service to a respective user based on the collected data" (claim 17)

| Cellwitch's Proposed Construction | Tile's Proposed Construction |
|---|---|
| No construction necessary. This term is not subject to 35 U.S.C. § 112, ¶ 6.<br><br>If construed:<br><br>"software component that uses data collected and stored by the [database (claim 5) / processor (claim 17)] to provide one or more functions to a user" | Invoking pre-AIA 35 U.S.C. § 112, ¶ 6. Indefinite, no sufficiently disclosed corresponding structure or algorithm |

The term "learning module . . ." appears in claims 5 and 17 of the '655 Patent, and claims 6–9 and 18–21 which depend upon claims 5 and 17.  Claim 5 recites "a learning module that uses the collected data to provide at least one service to a respective user" and claim 17 recites "providing, using a learning module, at least one service to a respective user based on the collected data."  ('655 Patent cls. 5, 17.)  The parties dispute whether this language is indefinite under pre-AIA 35 U.S.C. § 112 ¶ 6.  Tile argues that § 112 ¶ 6 should apply, and the claim terms are indefinite as means-plus-function terms lacking corresponding structures.  Cellwitch does not dispute that the terms would be indefinite under § 112 ¶ 6 (*see* Tr. at 78:4–11,) but argues that § 112 ¶ 6 should not apply.

1   Under § 112 ¶ 6, claims may be drafted "as a means or step for performing a specified

2   function without the recital of structure, material, or acts in support thereof, and [] shall be

3   construed to cover the corresponding structure, material, or acts described in the specification and

4   equivalents thereof." 35 U.S.C. § 112 ¶ 6. Section 112 ¶ 6 represents "a balance in allowing

5   patentees to express a claim limitation by reciting a function to be performed rather than by

6   reciting structure for performing that function, while placing specific constraints on how such a

7   limitation is to be construed . . . ." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed.

8   Cir. 2015). Thus, "if a person of ordinary skill in the art would be unable to recognize the

9   structure in the specification and associate it with the corresponding function in the claim, a

10  means-plus-function clause is indefinite." *Id.* at 1352; *see also*, *Dyfan, LLC v. Target Corp.*, 28

11  F.4th 1360, 1367 (Fed. Cir. 2022) ("The means-plus-function analysis asks two questions. First: Is

12  the disputed claim limitation drafted in means-plus-function format? Second, if and only if the

13  answer to the first question is 'yes': What, if any, is the structure corresponding to the claimed

14  function?" (internal citations omitted)).

15  In order to determine whether a claim limitation is subject to § 112 ¶ 6, courts begin with

16  the language of the claim. The Federal Circuit has long recognized that the "use of the word

17  'means' in a claim element creates a rebuttable presumption that § 112, para. 6 applies."

18  *Williamson*, 792 F.3d at 1348 (internal citation omitted). Conversely, "the failure to use the word

19  'means' also creates a rebuttable presumption—this time that § 112, para. 6 does not apply." *Id.*

20  Because the claim limitation here does not use the word "means," the Court begins with the

21  rebuttable presumption that § 112 ¶ 6 does not apply. Thus, the question before the Court here is

22  whether Tile, as the challenger, has demonstrated that "the claim term fails to 'recite[] sufficiently

23  definite structure' or else recites 'function without reciting sufficient structure for performing that

24  function.'" *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)) (alterations

25  original). In order to do so, Tile must "show, by a preponderance of the evidence, that persons of

26  ordinary skill in the art would not have understood the ['learning module'] limitations to connote

27  structure in light of the claim as a whole." *Dyfan*, 28 F.4th at 1367.

28  Applying this analysis here, the Court concludes that the term "learning module" does not

United States District Court
Northern District of California

recite a sufficiently definite structure, and that therefore, § 112 ¶ 6 applies to this claim element. First, the '655 Patent specification provides no guidance as to what a "learning module" is to a POSITA. In fact, the patent only references a "learning module" a total of three times: First, the specification (in language identical to the claims) discloses an embodiment in which "the processing system further comprises a learning module that uses the collected data to provide at least one service to a respective user." ('655 Patent at 3:51–53.) Later on, the specification states that [t]he central server 210 may include a processor 212, a memory unit, such as database 215, and a learning module 217." (*Id.* at 12:55–57.) Finally, the specification again describes that the "learning module 217 of the central server 210 may use the data to 'learn' usage patterns and build user profiles based on the known patterns." (*Id.* at 13:23–25.) None of these descriptions recite sufficiently definite structure such that a POSITA would understand what a "learning module" is. Indeed, the first and third descriptions are precisely recitations of "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1348 (quotation omitted). The second description is no better, only reciting that the central server may include, among other components (e.g., processor) a "learning module." This does not recite the structure of the "learning module" but instead the structure of the "central server" which may *include* a learning module.

Cellwitch, relying heavily on cases such as *Dyfan*, argues that extrinsic evidence provides sufficient connotation of structure. Cellwitch's expert, Dr. Goldberg, opines that a "learning module" means a "software component." (*See* Goldberg Decl. at ¶¶ 76–81.) The Court finds this argument unpersuasive. Dr. Goldberg's opinion relies upon the Authoritative Dictionary of IEEE Standards Terms, 7th Ed. for the definition of "module" as "[a] logically separable part of a program." (*See* Dkt. No. 191-11 at 8.) However, that definition is only one of several definitions for "module," and notably, one that is specific to *software* contexts. (*See id.*) Other definitions include "[a] collection of circuitry that is designed to perform a specific operation." (*Id.*) Nothing in the intrinsic evidence suggests that the term "learning module" is limited to describing software, such that other such definitions are inapplicable. Indeed, Dr. Goldberg's presumption that "module" must be defined in a software context seems to contradict the intrinsic evidence, as the

1    specification describes the "learning module" as a component of the central server, alongside

2    hardware components such as a "processor" and "memory unit."  (*See* '655 Patent at 12:55–57.)

3    By the canon of *noscitor a sociis*, this would suggest that a "learning module" should also be a

4    hardware component.  Similarly, the specification also uses the term "module" to describe

5    hardware components, such as a "Bluetooth module" or an "RFID module."  (*Id.* at 2:12–13.)  At

6    minimum, the Court is unconvinced by Cellwitch and Dr. Goldberg's assertion that a POSITA,

7    having read the specification and prosecution history, would understand "module" as used in the

8    '655 Patent to refer to a "logically separable part of a program" as opposed to a hardware

9    component such as a "collection of circuitry that is designed to perform a specific operation."

10   (Dkt. No. 191-11 at 8.)  Such ambiguity lends further support to the conclusion that "learning

11   module" does not recite a sufficiently definite structure and should be subject to § 112 ¶ 6.

12          Numerous other courts have found similar "module" terms subject to § 112 ¶ 6, even in the

13   absence of the word "means."  In *Williamson*, the Federal Circuit found that the word "module" is

14   a "well-known nonce word that can operate as a substitute for 'means' in the context of § 112,

15   para. 6."  *Williamson*, 792 F.3d at 1350.  There, it agreed with the district court's reasoning that

16   "module" "is simply a generic description for software or hardware that performs a specified

17   function."  *Id.*  Similarly, in *Rain Computing*, the Federal Circuit reaffirmed *Williamson*'s

18   reasoning that "module" is a well-known nonce word, and held that the asserted patents' use of

19   "user identification module" "fails to provide any structure for performing the claimed function."

20   *Rain Computing, Inc. v. Samsung Elecs., America, Inc.*, 989 F.3d. 1002, 1006 (Fed. Cir. 2021).

21   There, the Federal Circuit further reasoned that the patentee "fail[ed] to point to any claim

22   language providing any structure for performing the claimed function of being configured to

23   control access" and "[n]or does the prefix 'user identification' impart structure because it merely

24   describes the function of the module: to identify a user."  *Id.*  The Court finds that reasoning

25   particularly applicable to the '655 Patent here—as discussed above, the Court finds no intrinsic

26   evidence in the specification or claim language that provides any structure for the "learning

27   module," beyond "a generic description for software or hardware that performs a specified

28   function."  *Williamson,* 792 F.3d at 1350.  And, like in *Rain Computing*, here the prefix "learning"

United States District Court
Northern District of California

merely descries the function of the module, and provides no assistance to a POSITA seeking to ascertain what the structure of the "learning module" is. *Rain Computing*, 989 F.3d at 1006.

Cellwitch's cited authorities only serve to underscore the Court's conclusion. In *Blast Motion, Inc. v. Zepp Labs, Inc.*, No. 15-CV-700 JLS (NLS), 2017 WL 476428, at \*13 (S.D. Cal. Feb. 6, 2017), the court rejected the patent challenger's arguments that "initial motion recognition module" was subject to § 112 ¶ 6. In so doing, the court rejected the "broad proposition that the term 'module' automatically places it among terms such as 'means' and 'step for,' thus triggering a presumption that § 112 [¶ 6] applies" and that instead, an analysis of whether such terms fall under § 112 ¶ 6 is a case-by-case analysis depending on the language of the particular patent. This Court agrees with that reasoning. However, in that case, the patent at issue expressly stated the "initial motion recognition module" was a software module, and "describe[ed] an algorithm for performing the initial motion recognition." *Id.* at \*15. The court relied upon these disclosures to conclude that "the specification provides adequate structure to enable a person of ordinary skill to understand the structure of the 'initial recognition module,' what it does, and how it does it." *Id.* In contrast, here the '655 Patent provides no such structure or disclosure, as the Court found above. Instead, Cellwitch's only support for its proposed construction of "learning module" as a "software component" is Dr. Goldberg's opinion, and attorney argument, both of which the Court finds unpersuasive.

Similarly, Cellwitch cites to *One-E-Way, Inc. v. Apple Inc.*, No. 20-CV-06339-JAK-GJS, 2022 WL 2189529, at \*13 (C.D. Cal. Mar. 9, 2022). However, in that case, the disputed term in question—"direct conversion module"—was expressly defined in the specification as the same as a "direct conversion receiver," a device that the defendant "effectively concede[d] . . . were well-known at the relevant time, and could be generic off the shelf components." *Id.* (internal quotations omitted). Again, no such disclosure is present here in the '655 Patent to inform a POSITA as to the structure of a "learning module."

Finally, the Court rejects Cellwitch's arguments that § 112 ¶ 6 separately should not apply to claim 17, because it is a method claim. (*See* Cellwitch Br. at 20–21.) Here, Cellwitch cites to *Techno View IP, Inc. v. Facebook Techs., LLC*, No. CV 17-386-CFC-CJB, 2018 WL 6427874, at

*2–4 (D. Del. Dec. 7, 2018), an out of district case that interpreted what it described as "unclear" Federal Circuit caselaw and other district court opinions to "suggest that if a party asserts that a method claim element including a structural limitation invokes Section 112, paragraph 6, step-plus-function analysis applies, unless: (1) the claim element recites "means" (or a similar term); and/or (2) the structural limitation clearly constitutes the point of novelty in the invention or meaningfully alters claim scope." *Id.* at *4.  Even if the Court were to agree with the *Techno View* court's conclusion, here '655 Patent claim 17 would still be subject to § 112 ¶ 6's means-plus-function analysis because the "learning module" limitation is the only relevant limitation in dependent claim 17, and so indisputably "meaningfully alters" the scope of the claim.

For the above reasons, the Court finds that the preponderance of the evidence here suggests that the term "learning module" is subject to the means-plus-function requirements of pre-AIA § 112 ¶ 6.  Because Cellwitch agrees that the term would be indefinite under § 112 ¶ 6 (*see* Tr. at 78:4–11), the Court concludes that claims 5 and 17 of the '655 Patent, and all asserted claims depending on those claims, are invalid for indefiniteness.  *See Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1378 (Fed. Cir. 2013) (if independent claims are invalid for indefiniteness, dependent claims that "incorporate the elements" of the independent claim would also be invalid.).

**7.   "wherein the at least one service comprises providing a user default profile generated based on the collected data, the user default profile defining the proximity threshold"**

Because the Court finds that claims 5–9 and 17–21 are invalid for indefiniteness, it need not reach this claim term dispute, which relates only to terms in claims 6–9 and 18–21 of the '655 Patent.

**8.   "[providing an option to not generate] the alert"**

Because the Court finds that claims 5–9 and 17–21 are invalid for indefiniteness, it need not reach this claim term dispute, which relates only to terms in claims 7–9 and 19–21 of the '655 Patent.

\\

\\

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: April 23, 2024

_____
JEFFREY S. WHITE
United States District Judge