**KONING ZOLLAR LLP**
Drew Koning (263082)
drew@kzllp.com
Neal Gibeault (299730)
neal@kzllp.com
169 Saxony Road, Suite 115
Encinitas, CA 92024
Tel: (858) 252-3234
Facsimile: (858) 252-3238

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP**
NICOLE M. JANTZI (*Pro Hac Vice*)
nicole.jantzi@friedfrank.com
PAUL M. SCHOENHARD (*Pro Hac Vice*)
paul.schoenhard@friedfrank.com
801 17th Street NW
Washington, DC 20006
Tel: 202-639-7265

(additional counsel identified on signature block)

*Attorneys for Plaintiff Cellwitch Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| CELLWITCH INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TILE, INC.,<br><br>　　　　Defendant. | CASE NO. 4:19-CV-01315-JSW<br><br>**PLAINTIFF CELLWITCH INC.'S MOTION TO EXCLUDE THE TESTIMONY OF BRIAN W. NAPPER**<br><br>Date:　　　　April 18, 2025<br>Time:　　　　9:00 a.m. (Virtual)<br>Location:　　Courtroom 5<br>Judge:　　　Hon. Jeffrey S. White |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................ 1

II.   STATEMENT OF THE ISSUES TO BE DECIDED ................................................................... 1

III.   RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND .................. 1

IV.   LEGAL STANDARD ............................................................................................................ 2

V.   ARGUMENT ........................................................................................................................ 3

a.   Mr. Napper's Calculations Underestimate the Value of the Footprint ................................... 4

b.   Mr. Napper Conflates Monthly and Daily Active Usage of the Features Covered by the Footprint, Creating an "Apples-to-Oranges" Problem ........................................................ 8

c.   Mr. Napper's Apportionment Analysis Improperly Disregards Survey Evidence ................ 9

VI.   CONCLUSION .................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ................................................................................................ 2

*Canty v. DePuy Orthopaedics Inc.*,
   No. 14-CV-05407-JSW, 2024 WL 4149954 (N.D. Cal. Sept. 10, 2024)
   (White, J.) ......................................................................................................................... 2, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .......................................................................................................... 1, 2

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ...................................................................................... 3, 4, 8

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) .......................................................................................... 3, 8

*Garretson v. Clark*,
   111 U.S. 120 (1884) ............................................................................................................. 3

*Goodness Films, LLC v. TV One, LLC*,
   2014 WL 12780291 (C.D. Cal. May 19, 2014) .................................................................... 3

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) .......................................................................................................... 3, 11

*Lucas v. MGM Resorts Int'l*,
   724 F. Supp. 3d 1142 (D. Nev. 2024) ................................................................................ 3, 8

*Valentine v. Torres-Quezada*,
   No. 22-CV-01520-JSW, 2024 WL 3463822 (N.D. Cal. July 17, 2024) ............................. 2, 3

**Other Authorities**

Fed. R. Evid. 403 ......................................................................................................................... 1

Fed. R. Evid. 701 ......................................................................................................................... 1

Fed. R. Evid. 702 ................................................................................................................... 2, 10

Fed. R. Evid. 703 ......................................................................................................................... 1

Fed. R. Evid. 704 ......................................................................................................................... 1

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on Friday April 18, 2025 at 9:00 AM PDT, or as soon thereafter as the Motion may be heard, before the Honorable District Judge Jeffrey S. White, Plaintiff Cellwitch Inc. ("Cellwitch") will and hereby does move to exclude the expert opinions and proffered testimony of Brian W. Napper with respect to apportionment for purposes of a patent damages analysis. Exclusion is warranted because Mr. Napper's opinions are not based on reliable data or methods as required under the Federal Rules of Evidence and well-established precedent. The Motion is based upon this Notice, the Argument below, the February 7, 2025 Declaration of Paul M. Schoenhard in support of the Motion, pleadings, and such other matters as the Court may deem appropriate in deciding this Motion.

**RELIEF REQUESTED**

Cellwitch respectfully requests that the Court exclude the proposed testimony of Brian W. Napper with respect to apportionment for purposes of a patent damages analysis.

I.  **INTRODUCTION**

Brian W. Napper[1] was engaged by Tile ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. 80 ("Napper Rpt.") at ¶ 6.[2] In this role, Mr. Napper submitted the Napper Report and was deposed on January 15, 2025. Ex. 81 ("Napper Tr."). While Mr. Napper is qualified to serve as an expert with respect to patent damages generally, his apportionment analysis in this case is unreliable.

Mr. Napper's task was to evaluate the incremental value of certain features of the accused Tile Network, what he refers to as the footprint of the invention ("Footprint").[3] Unfortunately, Mr. Napper attempts to perform an apportionment based on periodic usage data in a manner that grossly underestimates the incremental value of the Footprint. Mr. Napper's apportionment is based on apples-to-oranges comparisons between inconsistent types of usage data. And Mr. Napper improperly discounts the significance of survey data **produced by Tile** that he does not have sufficient expertise to assess. If admitted at trial, Mr. Napper's unreliable opinions on the issue of apportionment introduce a high risk of jury confusion and prejudice to Cellwitch.

II.  **STATEMENT OF THE ISSUES TO BE DECIDED**

Whether—under Federal Rules of Evidence 403 and 701–04 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)—the proffered expert testimony of Brian W. Napper related to apportionment, survey analysis, and alternative damages analysis must be excluded because it is unreliable and/or is outside the scope of his expertise.

III.  **RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

On December 6, 2024, Tile submitted the Napper Report, which articulates the opinions Mr. Napper intends to present at trial. *See generally* Ex. 80 ("Napper Rpt."). Based on his CV, "Mr.

---

[1] Mr. Napper's expert report was jointly submitted and co-signed by Shelly D. Irvine. To the extent that Ms. Irvine intends to testify as to any of the opinions addressed in the Napper Report, Cellwitch moves to exclude Ms. Irvine's testimony to the same extent and for the same reasons it moves to exclude Mr. Napper's.

[2] References to "Ex. __" are to exhibits to the Declaration of Paul M. Schoenhard dated February 7, 2025, attached herewith.

[3] Cellwitch disputes Mr. Napper's narrow understanding of the Footprint, but recognizes that the parties' dispute in this regard is factual, rather than methodological.

Napper has over 30 years' experience in the evaluation and quantification of economic damages arising from patent, copyright, and trademark infringement and trade secret misappropriation disputes." *Id.* at App'x A. On January 15, 2025, Cellwitch took the remote deposition of Mr. Napper. *See* Ex. 81 ("Napper Tr."). Despite Mr. Napper's decades of experience, there were numerous red flags present in the Napper Report and confirmed at his deposition that could not be ignored. In order to avoid the high probability of both unfairly prejudicing Cellwitch and misleading the jury, Cellwitch files the present motion to exclude certain of Mr. Napper's opinions.

## IV.    LEGAL STANDARD

Tile bears the burden to show that its experts' testimony is admissible. *Daubert*, 509 U.S. at 592 n.10; *see also Canty v. DePuy Orthopaedics Inc.*, No. 14-CV-05407-JSW, 2024 WL 4149954, at *5 (N.D. Cal. Sept. 10, 2024) (White, J.). As this Court has held, under Federal Rule of Evidence 702, expert witness opinion evidence is only admissible if: (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's scientific, technical, or other specialized knowledge may help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *Canty, No. 14-CV-05407-JSW, 2024 WL 4149954, at *4*; *see also Valentine v. Torres-Quezada,* No. 22-CV-01520-JSW, 2024 WL 3463822, at *4 (N.D. Cal. July 17, 2024).

In conducting this analysis, "the trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Canty*, 2024 WL 2852213 at *2 (cleaned up and citations omitted). This inquiry requires "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citing *Daubert*, 509 U.S. at 592–93). The district court is tasked with deciding whether the expert's testimony "has such substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969–70 (9th Cir. 2013).

A damages expert must "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible[.]" *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309–10 (Fed. Cir. 2018). While a damages expert "could do this in various ways . . . [t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson* at 1226. In order for an expert's apportionment analysis to be reliable, the "ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product[.]" *Finjan* at 1309.

"[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). In cases where experts are testifying based on specialized or technical knowledge, "the relevant reliability concerns may focus upon personal knowledge or experience." *Valentine*, 2024 WL 3463822, at *2 (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)).

When an expert relies on data comparison, courts need "to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Goodness Films, LLC v. TV One, LLC*, 2014 WL 12780291, at *2 (C.D. Cal. May 19, 2014) (quoting *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013)). Comparing "apples-to-oranges" warrants excluding an expert's opinion. *Lucas v. MGM Resorts Int'l*, 724 F. Supp. 3d 1142, 1155–56 n.98 (D. Nev. 2024).

## V.   ARGUMENT

Mr. Napper correctly appreciates that a proper patent damages analysis requires consideration of apportionment. But Mr. Napper's apportionment analysis improperly relies on periodic usage data, compares apples to oranges, and improperly discounts relevant survey data. The result is an apportionment that is separated from reality by orders of magnitude.

### A. Mr. Napper's Calculations Underestimate the Value of the Footprint

Mr. Napper's apportionment analysis relies on periodic active usage data (*i.e.* daily or monthly active use of a particular feature). *See* Ex. 80 ("Napper Rpt.") at ¶¶ 180–87. While there is nothing *per se* improper about relying on usage data to calculate the incremental value of particular Tile features—indeed, there are multiple ways to make this calculation (*see, e.g.*, *Ericsson*, 773 F.3d at 1226)—Mr. Napper's analysis is nevertheless fatally flawed.

Based on discussions with Tile's technical expert, Mr. Napper understands the Footprint to be limited to three features: Sharing, Location History, and Smart Alerts. *See* Ex. 80 ("Napper Rpt.") at ¶ 46.[4] Based on his analysis—which relies on periodic usage data (*id.* ¶¶ 180–87)—Mr. Napper estimates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 13. Based on Mr. Napper's testimony, ▮▮▮▮▮▮ reflects the portion of hardware margin he apportions to the Footprint and the balance, ▮▮▮▮▮▮ is the amount of Tile subscription margin he apportions to the Footprint. Ex. 81 ("Napper Tr.") at 87:4–11. This range clearly does not capture the "incremental value that the patented invention adds[.]" *Ericsson*, 773 F.3d at 1226.

Mr. Napper's apportionment of Tile's subscription revenue helps illustrate the problem with his apportionment analysis. Tile users who choose to purchase Tile Premium subscriptions have access to six features: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 80 ("Napper Rpt.") at ¶ 40. Of these, as noted above, the first three—Smart Alerts, 30-day Location History, and Unlimited Sharing—fall within what Mr. Napper acknowledges is the Footprint. Ex. 80 ("Napper Rpt.") at ¶ 46. The question is thus: what portion of Tile's incremental margin from U.S. subscriptions is attributable to these three features?

According to Mr. Napper, Tile has earned approximately ▮▮▮▮▮▮▮ in incremental margin from U.S. subscriptions. Ex. 81 ("Napper Tr.") at 82:1–10; Ex. 80 ("Napper Rpt.") at Sched. 1.2. If each feature contributed equal value, then the contribution of each would be, on average, approximately ▮▮▮▮▮▮ But Mr. Napper (not unreasonably) attempts to be more precise.

---

[4] Again, Cellwitch does not adopt Mr. Napper's understanding of the Footprint.

      This is where Mr. Napper goes wrong. Based on his analysis of usage data, Mr. Napper attributes just ▮ of Tile's subscription revenue to all of the Footprint's features **combined**: ▮ to Sharing (Ex. 80 ("Napper Rpt.") at ¶ 181); ▮ to the combination of Smart Alerts and Sharing (*id.* ¶ 183); and 1.57% to the combination of Location History and Sharing (*id.* ¶ 186). (Without any usage data, Mr. Napper thus attributes nearly ▮ of Tile's incremental margin from subscriptions to Worry-Free Warranty, Premium Customer Care, and item reimbursement.)

      While each of these numbers appears to be an underestimate, the value Mr. Napper assigns to Smart Alerts—just ▮—is particularly glaring. According to Mr. Napper, of Tile's ▮ in incremental margin from subscriptions, only $4200 is, in his opinion, attributable to Smart Alerts. Ex. 81 (Napper Tr.) at 83:17–84:4. To put this in context, Tile's corporate witness on the issue of analytics testified that ▮. Ex. 82 (Goffeney 30(b)(6) Tr.) at 52:18–22. And surveys commissioned by Tile found that ▮

▮

Ex. 99 (TILE_CELL_0053104–24) at -118. Even relying on Mr. Napper's Sharing utilization calculation ▮ (*see* Ex. 80 at ¶ 213), the portion of Tile subscribers who both had Smart Alerts

---

[5] By contrast, ▮ Ex. 99 at TILE_CELL_0053118.

activated and used the Sharing feature is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This figure is **over** ▮▮▮ **greater than** the ▮▮▮ that Mr. Napper calculated.

The reason for this massive discrepancy is simple: ***measuring the active use of a passive feature grossly underestimates its value***. A passive feature is unlikely to be used every day, or indeed, every month. As an illustrative example, a first aid kit is a passive product that a customer purchases with the hopes of *never* using. No one intends to be injured, but a first aid kit provides value to the customer knowing that it *could be used* in the event it is needed. Even during the infrequent situations when a first aid kit is used, not every implement within the first aid kit will be used to treat every injury (*e.g.*, an ace bandage will not be used to treat a cut, and a band-aid would not be used to treat a sprain). The value of a first-aid kit is not based on the frequency it gets used but in having it on hand when you need it.

The same is true of the Footprint's features. Mr. Napper acknowledges that a Tile device, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 80 ("Napper Rpt.") at Fig. 11 (citing Ex. 83 (TILE_CELL_0008058–84) at -075). During his deposition, Mr. Napper acknowledged that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 81 ("Napper Tr.") at 114:47–12. The Footprint's features similarly provide customers value even when they are not being actively used by those customers at any given moment. Indeed, a customer could derive significant value from using an accused feature only once.

Smart Alerts are (generally) passive: a Tile user will not receive a Smart Alert ***unless*** the user leaves a tracked personal item behind. As of ▮▮▮▮▮▮▮▮▮▮▮ of Tile subscribers had the Smart Alerts feature activated. Ex. 82 at 52:18–22. Rather than relying on this figure (or any other calculation of the portion of Tile devices or users that have activated the Smart Alerts feature), Mr. Napper relies on the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 80 ("Napper Rpt.") at ¶ 183; *id.* at Sched. 5.0. The percent of Tile users who receive Smart Alerts in any given time period is ▮▮▮▮▮▮▮ lower than the percent of Tile users who pay for a Tile subscription and have Smart Alerts enabled. And, significantly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▓▓▓▓▓▓▓▓▓▓. Ex. 99 (TILE_CELL_0053104) at -118. Clearly, the value of Smart Alerts is not dictated by the number of times people leave their things behind and thus receive Smart Alerts.

Mr. Napper makes a similar mistake with respect to Sharing. Mr. Napper calculated ▓▓▓ (Ex. 80 ("Napper Rpt.") at ¶ 213) as ▓▓▓ (*id.* ¶ 181).[6] Mr. Napper does not use the periodic usage data to then extrapolate the cumulative number of Tile users or devices to have used any particular accused feature. And the result is an apportionment that significantly underestimates reality. Internally, Tile calculated that ▓▓▓ *Id.* ¶¶ 70, 173 (citing Ex. 84 (TILE_CELL_0000053248–97) at -297)). Elsewhere, Mr. Napper relies on a completely different estimate of Sharing use: ▓▓▓ *Id.* at ¶ 186, Sched. 3.0. Further, ▓▓▓ (TILE_CELL_0053104) at -118. Nonetheless, Mr. Napper effectively halved (or quartered) the actual utilization percentage of the Sharing feature (and completely disregarded the actual value of the feature to customers) in his apportionment analysis.

30-day Location History is also a passive feature of the Tile network: it is useful to a Tile user when that user loses or misplaces a personal item, not necessarily every day. And although Mr. Napper testified that the total percent of users who utilized Location Sharing could be significantly greater than the percent of users who utilized Location Sharing in any given day, Ex. 81 ("Napper Tr.") at 20:17–21:14, Mr. Napper estimates the value of Tile's location history feature based on ▓▓▓ Ex. 80 ("Napper Rpt.") at ¶ 185. Mr. Napper's estimate of the use of the Location History feature could therefore be off by an order of magnitude.

---

[6] Due to internal inconsistencies within the Napper Report, it is unclear whether his ▓▓▓ calculation refers to the percent of users who have shared a device (Ex. 80 ("Napper Rpt.") at ¶ 162) or the percent of Tile devices being shared (*id.* ¶ 181). His deposition testimony is equally unclear. *See, e.g.*, Ex. 81 ("Napper Tr.") at 81:16–22, 99:13–22.

Additionally, while Mr. Napper looks at usage data for the Footprint's features (Sharing, Location History, and Smart Alerts), he does not compare this to usage data for the features outside the Footprint. He does not evaluate whether usage of the Footprint's features is higher, lower, or comparable to the usage of the features outside the Footprint. Without knowing the frequency that the features outside the Footprint are used—and how this compares to the frequency the features covered by the Footprint are used—Mr. Napper cannot reliably calculate the "value attributable to the infringing features of the product" based on usage data. *Finjan*, 879 F.3d at 1309.

### B. Mr. Napper Conflates Monthly and Daily Active Usage of the Features Covered by the Footprint, Creating an "Apples-to-Oranges" Problem

Another critical flaw in Mr. Napper's apportionment analysis is his reliance on apples-to-oranges comparisons, a mistake that warrants exclusion of his apportionment analysis. *Lucas*, 724 F. Supp. 3d at 1155–56 n.98. In paragraphs 180–87 of the Napper Report, Mr. Napper relies on inconsistent usage statistics of the features covered by the Footprint, relying on daily active use ("DAU") for certain features and monthly active use ("MAU") for other features. He also interchangeably relies on usage by number of Tile devices and usage by number of Tile users. These numbers are not apples-to-apples comparisons, and Mr. Napper does not explain how or why he chose the usage statistics for each feature. Worse still, Mr. Napper cites to Tile's internal data in Schedules 3.0 and 4.2 of the Napper Report that would have enabled him to refer to standardized usage statistics across the Footprint. While there may be a way to rely on usage data to determine the incremental value of the Asserted Claims (*see Ericsson* at 1226), Mr. Napper's reliance on cherry-picked usage statistics is a disqualifying error.

With respect to Smart Alerts, Mr. Napper relies on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 80 ("Napper Rpt.") at ¶ 183, Sched. 5.0. With respect to the Location History feature, Mr. Napper relies on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 185, Sched. 4.2. With respect to the Sharing feature, Mr. Napper relies on two completely different usage statistics with no explanation as to why: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* ¶ 181, Sched. 3.2); and the ▮▮▮▮▮▮▮▮▮▮▮

▓▓▓▓▓▓▓▓▓▓▓▓ (*id.* ¶ 186; Sched. 3.0). While Mr. Napper could have plausibly justified apportioning based on comparable usage statistics, he did not do so here.

These shortcomings in Mr. Napper's apportionment analysis produced an unquestionably misleading and unreliable estimate of the incremental value of the Footprint, and, therefore, Mr. Napper's opinions related to periodic usage data—as summarized in paragraphs 70, 173, 180–87, 213, and schedules 3.0, 3.1, 3.2, 4.2, and 5.0, and as cited elsewhere throughout the Napper Report—should be excluded.

### C. Mr. Napper's Apportionment Analysis Improperly Disregards Survey Evidence

Mr. Napper repeatedly critiques Mr. Holzen's use of survey data produced by Tile in this case as a tool for apportionment. Ex. 80 ("Napper Rpt.") at ¶¶ 58–67. However, it is Mr. Napper—not Mr. Holzen—who lacks experience and expertise in using survey data for apportionment.

As Mr. Holzen testified, he received training on how to ▓▓▓▓▓▓▓▓▓▓ beginning in 2007 when he worked at Ocean Tomo. Ex. 86 (Holzen Tr.) at 181:16–25. Mr. Holzen further testified, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and that he had personally conducted similar survey analysis in multiple cases over the past year. *Id.* at 182:1–6. Mr. Napper, by contrast, testified that he has received ▓▓▓▓▓▓ in how surveys are to be designed or conducted. Ex. 81 ("Napper Tr.") at 75:14–16 ▓▓▓▓▓▓▓▓▓▓▓. Nowhere in his CV—or anywhere else in his report for that matter—does Mr. Napper identify that he has any training or experience in survey analysis. *See* Ex. 80 ("Napper Rpt.") at App'x A.

Mr. Napper took particular issue with Mr. Holzen relying on net promoter scores ("NPS") for apportionment. Ex. 80 ("Napper Rpt.") at ¶¶ 61–65, 180. On this point, Mr. Holzen testified that he ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, including in multiple cases in the past two years, and that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ex. 86 at 208:21–209:14. Mr. Holzen's analysis of surveys and NPS as part of a royalty rate calculation—analysis he performs regularly as a damages expert—has never been

excluded by a court. By contrast, Mr. Napper admitted that he had ████████ ████ prior to reading Mr. Holzen's report. Ex. 80 ("Napper Rpt.") at ¶ 61 ██████ ██████████████████; Ex. 81 ("Napper Tr.") at 43:5–8 ████████████████████ ████████████████████████████████████████████████ ██████. And even as of his deposition, Mr. Napper's "knowledge" of net promoter scores was limited to ██████████████████████████████████████. Ex. 80 ("Napper Rpt.") at ¶ 61; Ex. 81 ("Napper Tr.") at 44:3–12. Mr. Napper further stated that he did not understand ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ Ex. 80 ("Napper Rpt.") at ¶ 63.[7]

Cellwitch is not challenging Mr. Napper's general expertise in evaluating damages in intellectual property disputes, but as to his assessment of survey evidence and net promoter scores in particular, Mr. Napper clearly lacks the "knowledge, skill, experience, training, or education … in order to help the trier of fact to understand the evidence[.]" Fed. R. Evid. 702(a). Mr. Napper cannot say "the reasoning or methodology underlying [his] testimony is scientifically valid" because there is no reasoning or methodology. *Canty*, 2024 U.S. Dist. LEXIS 100233 at *5.

In understanding why Mr. Napper's opinions on survey analysis are unreliable, *Mission 1st* is instructive. *See* No. 1:23-CV-1682-DJN, at *15–20 (E.D. Va. Dec. 10, 2024). In *Mission 1st*, plaintiff challenged the qualifications of defendant's damages expert. *Id.* While the court found "no reason to doubt [the expert's] expertise in economics *generally*," it found that defendant's damages expert lacked the relevant expertise "to enable him to assist the jury on *specific* questions[.]" *Id.* at *17 (emphasis added). Among the reasons the court found the expert's experience lacking were: the expert had "no specific education or training" related to the specific issue; he had "little to no professional experience" related to the specific issue; and the expert lacked any "specialized knowledge" and "relied exclusively on the work of other authors to acquire the knowledge required

---

[7]  Mr. Napper should also be excluded from offering any legal opinions, including making any reference to what is or is not "required by case law."

of him." *Id.* at 16–18. The same is true here. Mr. Napper testified to both ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 81 ("Napper Tr.") at 43:5–8, 75:14–16. Mr. Napper further testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 44:3–12.

Mr. Napper is not an "expert in the relevant field" and his opinions highlight the lack of intellectual rigor he applied to critiquing Mr. Holzen's methodology. *Kumho*, 526 U.S. at 152. That is not proper expert testimony, and Mr. Napper should be excluded from presenting any of opinions contained in paragraphs 58–67 of the Napper Report.

## VI.  CONCLUSION

For the foregoing reasons, Cellwitch requests that the Court exclude the proposed testimony of Brian W. Napper with respect to apportionment for purposes of a patent damages analysis, including the material stated in paragraphs 58–67, 70, 173, 180–87, and 213 and schedules 3.0, 3.1, 3.2, 4.2, and 5.0 of the Napper Report.

Respectfully submitted,

DATED: February 7, 2025

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP

By: /s/ Paul M. Schoenhard
Nicole M. Jantzi (*Pro Hac Vice*)
(nicole.jantzi@friedfrank.com)
Paul M. Schoenhard (*Pro Hac Vice*)
(paul.schoenhard@friedfrank.com)
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7265

Jason S. Kanterman (*Pro Hac Vice*)
(jason.kanterman@friedfrank.com)
FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000

Drew Koning (SBN 263082)
(drew@kzllp.com)
Neal Gibeault (SBN 299730)
(neal@kzllp.com)
KONING ZOLLAR LLP
169 Saxony Road, Suite 115
Encinitas, CA 92024
Telephone: (858) 252-3234
Facsimile: (858) 252-3238

*Attorneys for Plaintiff Cellwitch Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on February 7, 2025.

                                              */s/ Tanya Cooper*
                                              Tanya Cooper, Senior Paralegal